EDMOND M. GEORGE AND JOAN GEORGE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
George v. Commissioner
Docket No. 1952-75.
United States Tax Court
T.C. Memo 1979-131; 1979 Tax Ct. Memo LEXIS 395; 38 T.C.M. (CCH) 591; T.C.M. (RIA) 79131; April 5, 1979, Filed *395 Petitioner owed a building which housed a social club. The building was condemned. Petitioner purchased replacement property. Held, recognition of gain upon receipt of the condemnation proceeds is limited by sec. 1033. Held further, petitioner was found to have additional unreported income. Clifford J. Ross, for the petitioners. W. Terrence Mooney and Willard J. Frank, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on December 13, 1974, issued a statutory notice in which he determined a deficiency in petitioners' Federal income tax for their taxable year ended December 31, 1970 in the amount of $19,836.46 and an addition to tax under section 6653(b), I.R.C. 1954 for fraud in the amount of $9,918.23. Respondent has conceded that the addition to tax was unwarranted. The following issues remain for our determination: (1) whether petitioner Edmond M. George received unreported income in the amount of $41,884.48 during the 1970 taxable year from the Syrian American Citizens Association, and (2) whether petitioners had additional unreported income for that year totaling $2,640.89. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, *397 and the exhibits attached thereto, are incorporated herein by this reference. Petitioners Edmond M. George and Joan George, husband and wife, resided in Manchester, New Hampshire at the time of filing the petition herein. Petitioners filed their joint Federal income tax return for the calendar year 1970 with the Internal Revenue Service, Andover, Massachusetts. Joan George is a party to this action only because she joined in the filing of this return and, accordingly, Edmond M. George will hereinafter be referred to as petitioner. In 1938 a group of Manchester citizens formed the Syrian American Citizens Association (hereinafter SACA). The club was originally set up as an educational club to teach and train immigrants. Over the years SACA evolved into a social club, operating out of rented premises on Spruce Street in Manchester. On July 12, 1960 a deed of warranty was recorded with the Hillsborough Couty Registry of Deeds which reflected that SACA had purchased a building at 110 Central Street in Manchester. By mid-1963 SACA, which was having financial difficulties, calculated that its equity in the building was, at most, $5,600. Petitioner had furnished the remainder *398 of the original cost, most of the improvements, and most of the repairs. The improvements included adding two rooms which practically doubled the size of the building, adding hear and air conditioning and completing a restaurant. Petitioner also added flooring, carpeting, tile, furnishings and bar equipment. On June 3, 1963 SACA, at a meeting of its board of directors, agreed that the building would "revert" to petitioner, who was SACA's secretary-treasurer, upon his payment to SACA of $5,600. This proposal was accepted unanimously by all members (74) and officers of SACA present at the meeting. Petitioner paid the $5,600 through the payment of interest and by sponsoring outings or parties for SACA's members. From 1963 to 1970 SACA continued to hold regular meetings at the Central Street building. The club also continued to hold title to the property and to take depreciation for the building on its Federal income tax returns. Petitioner paid the taxes and insurance on the building. The club membership passed on club operations, improvements and equipment purchases. During these years petitioner managed the club for wages, which in his taxable year 1970 totaled $7,650. *399 In 1970 the Manchester Housing Authority (hereinafter MHA) ordered that the Central Street property be condemned and taken as part of the urban renewal program. The petition for condemnation listed SACA and Merchants Savings Bank as owners of record of the property. Petitioner objected to the original tender of payment in the amount of $45,000. With the assistance of counsel he brought suit against MHA in SACA's name before the Land Damages Committee or Eminent Domain Commission which returned a verdict of $65,000. MHA appealed that award to the Hillsborough County Superior Court. That body held a jury trial which awarded payment of $45,000. Pursuant to the stipulated award an agreement was reached between petitioner, SACA and MHA which acknowledged that, because SACA intended to transfer the award to petitioner, he would be liable to MHA for any adjustment made to the award of damages. SACA then signed over the Central Street property to MHA by quitclaim deed. MHA issued a chick dated December 7, 1970 to SACA in the amount of $45,973.87. Petitioner, in late 1970, purchased property in his own name located at 102 Spruce Street (hereinafter the Spruce Street property) *400 for the purpose of housing SACA. Petitioner used $35,354.32 of the proceeds received in the condemnation suit to reduce a mortgage which encumbered that property. He also transferred equipment, valued by respondent at $5,438.52, from the Central Street property to the new premises. SACA then leased the Spruce Street property from petitioner commencing January 1, 1971 at a monthly rate of $600. Petitioner and Alfred Minuti formed a partnership which operated gambling junkets to Las Vegas for Manchester residents. In addition to arranging the junkets, it collected money, which represented debts incurred while gambling, from tour participants. For the 1970 taxable year, the partnership collected a total of $36,450 and remitted $34,950 to the Stardust Hotel in Las Vegas. It retained the remaining $1,500 as a collection fee. The partnership opened a savings account at the Merchants National Bank in Manchester. The bank ledger sheet for the period April 10, 1970 to June 12, 1970 reflects interest credited totaling $80.17. On August 17, 1970 Agnes Bockman paid petitioner a total of $1,728. Broken down, this amount reflects a loan repayment of $1,600 together with interest of *401 $128. Respondent determined that one-half the collection fee from the gambling junkets ( $750) and one-half the bank interest ($40.09) were additional income to petitioner in 1970, as was the $128 interest he received from Agnes Bockman. Respondent also determined that petitioner received unreported commissions of $1,722.80 from his aluminum siding business. OPINION Issue 1. Receipt from SACA
Petitioner contends that the funds he received pursuant to the condemnation of the Central Street property were not additional income. He alternatively argues that such amounts represented condemnation proceeds, receipt of which did not produce a gain, and that under section 1033 the gain, if any, would not be recognized. The formal records produced at trial are against petitioner: The Central Street property was recorded in SACA's name; the controversy over the condemnation award cited SACA as owner and SACA continued to depreciate the Central Street building from its form 990 return. However, petitioner's credible explanation, supported by the testimony of an active, 40-year member of SACA, indicates that, in substance, petitioner was th owner of the Central Street property. *402 SACA agreed that ownership of the property would "revert" to petitioner upon payment of $5,600. SACA further agreed that "[if] a new building must be bought or built because of Urban Renewal, the new building will be in his (Mr. George's) name only." The record indicates that petitioner made the requisite payment, that petitioner paid the remainder of the $17,500 price of the Central Street property, that petitioner then made and paid for extensive improvements on that site, and that it was petitioner who challenged the condemnation award. There was no evidence that SACA raised any objection to petitioner's receipt of the condemnation award money or with his use thereof. We hold that he was the real owner of the property in issue. It does appear that petitioner and SACA are unsophisticated taxpayers who have failed to record accurately their transactions. Moreover, petitioner's brief indicates a lack of understanding of tax law. In his first alternative he claims that a loss was realized because the property's value was between $82,450 and $96,500. Thus "[the] adjusted basis would be petitioner's original cost ($17,500) adjusted upwards for improvements (add $64,950 *403 for a $82,450 valuation or $79,000 for a $96,500 valuation) and adjusted downward for depreciation." For purposes of determining gain or loss the adjusted basis is the original cost of the property plus capital expenditures less depreciation. Sections 1011, 1012 and 1016(a). Indications of fair market value are irrelevant and cannot be equated, without appropriate evidence, with cost. Thus, although the record indicates that petitioner paid $17,500 for the property and that he spent time and money on improvements thereto, he has not established the amount of capital expenditures made with respect to such improvements or the resultant basis for purposes of proving the asserted loss from the condemnation. Petitioner's second alternative is more cogent. For the year in issue section 1033 provides in pertinent part: SEC. 1033. INVOLUNTARY CONVERSIONS.
(a) General Rule.--If property (as a result of its * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- * * * (3) Conversion Into Money.--Into money or into property not similar or related in service or use to the converted property, the gain (if any) shall be recognized except *404 to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property * * *. Such election shall be made at such time and in such manner as the Secretary may be regulations prescribe. * * * * * * (B) Period Within Which Property Must be Replaced.--The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) 2 years after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate *405 on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe. Income Tax Regs. section 1.1033(a)-2(c)(2) provides that an election for nonrecognition is deemed made if the taxpayer fails to include the gain realized upon conversion in his gross income "even though the details in connection with the conversion are not reported" on the return for the year in which the gain is realized. We have found that petitioner was the owner of the Central Street property. Such property was involuntarily converted into money through condemnation. Petitioner purchased the Spruce Street property for the purpose of replacing the condemned property. The Central Street property was converted in 1970, the taxable year in which the Spruce Street property was purchased. Respondent's only argument in response to petitioner's claim for relief under section 1033 is that petitioner was not the owner of the Central Street property. Our converse finding negates this argument. We find that section 1033(a)(2) causes nonrecognition of gain, if any, realized on the conversion of the Central Street property except to the extent *406 that such gain exceeds the cost of the Spruce Street replacement property. We understand that the parties will reach an agreement on petitioner's cost of the replacement property for purposes of a computation under Rule 155. We do note that both petitioner's and SACA's tax returns display an apparent lack of communication between the taxpayers and the accountants who worked on the returns both with respect to the taking of depreciation on the building and the calculation of profits from Club Sahara. We admonish petitioner that the returns must reflect the actions of the parties and that he should reconstruct, as far as possible, the records, which he testified were destroyed by fire, in order to determine his basis. Petitioner has presented no evidence with respect to the following items of income alleged by respondent: $ 600.00
received from SACA as rent
294.78
telephone expenses
5,438.52
equipment of SACA taken by petitioner
196.86
insurance
While he could hypothesize that the equipment was not "taken" by petitioner, but moved from one SACA clubhouse to another for the members' use, the total absence of facts on the record concerning these items leaves *407 us no choice but to uphold respondent's determination. Welch v. Helvering,290 U.S. 111, 115 (1933). Issue 2. Additional Income
Respondent determined that petitioner received additional unreported income totaling $918.09, broken down as $750 of the $1,500 collection fee with respect to the gambling junkets, $40.09 of the $80.17 interest income from the savings account, and the $128 interest income from the savings account, and the $128 interest income he received from Agnes Bockman. Petitioner has stipulated that he did receive such amounts and has presented no argument with respect to these amounts on brief. Respondent also determined that petitioner received unreported commissions of $1,722.80 from his aluminum siding business. Petitioner has presented no facts in contradiction to respondent's determination and no argument on brief with respect to this amount. We find for respondent on this issue. Decision will be entered under Rule 155.